# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AYESHA DENISE MOORE,      )
                                 )   No. 15 CV 4291
            **Plaintiff,**      )
                                 )
   v.                             )   Magistrate Judge Young B. Kim
                                 )
CAROLYN W. COLVIN, Acting      )
Commissioner, Social Security      )
Administration,                  )
                                 )   October 6, 2016
            **Defendant.**      )

## MEMORANDUM OPINION and ORDER

Ayesha Moore filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits alleging that she is disabled by myasthenia gravis. After the Commissioner of the Social Security Administration denied her applications, Moore filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Moore's motion for summary judgment. For the following reasons, the motion is denied and the Commissioner's final decision is affirmed:

## Procedural History

Moore filed her concurrent DIB and SSI applications on January 4, 2012, alleging a disability caused by myasthenia gravis ("MG") since November 24, 2011. (Administrative Record ("A.R.") 162-74.) Her claims were denied initially on February 24, 2012, and on reconsideration on September 13, 2012. (Id. at 81-84.) Moore requested and was granted a hearing before an Administrative Law Judge

("ALJ") which took place on September 4, 2013. (Id. at 29-80.) On November 27, 2013, the ALJ issued a decision finding that Moore is not disabled and thus not entitled to DIB or SSI. (Id. at 8-24.) When the Appeals Council declined review, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Moore filed this action seeking judicial review, (R.1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R.5); *see* 28 U.S.C. § 636(c).

## Background

Moore was 27 years old and working as a mail carrier for the U.S. Postal Service in November 2011, when she alleges that symptoms stemming from MG forced her to stop working. Myasthenia gravis is a "disease characterized by progressive weakness and exhaustibility of voluntary muscles without atrophy or sensory disturbance and caused by an autoimmune attack on acetylcholine receptors at the neuromuscular junction." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/myasthenia%20gravis, (last visited Sept. 29, 2016). At her hearing before the ALJ, Moore presented documentary and testimonial evidence in support of her claim that her MG symptoms render her disabled.

## A.    Medical Evidence

Medical records indicate that since August 2009 Moore has been a patient at Rush University Medical Center, where Dr. Megan Shanks has been treating her for MG. (A.R. 300.) On October 26, 2009, Moore underwent a pulmonary test which

resulted in a finding that she had respiratory muscle weakness consistent with MG. (Id. at 310.) That same day Moore reported to Dr. Shanks that the effects of the prednisone she had been prescribed wore off within an hour. (Id. at 310.) After a physical examination, Dr. Shanks noted mostly normal results other than some issues with voice quality and diplopia. (Id.) Dr. Shanks informed Moore of the dangers of taking certain MG medications while pregnant. (Id. at 301.)

In March 2010, after a flare up of MG symptoms, Dr. Shanks increased Moore's prednisone prescription. (Id. at 294.) During a follow-up visit two months later, Dr. Shanks again increased her prednisone dose because the previous increase had not helped her symptoms. (Id. at 291.) Throughout 2010, Moore visited Dr. Shanks with fluctuating reports of her condition. While she reported "less severe" symptoms at times, she also reported flare-ups involving double vision and speech slurring. (Id. at 286, 290.)

On November 11, 2010, Dr. Shanks prepared a note for Moore's manager informing him that Moore's medical condition continued to warrant work restrictions. (Id. at 285.) She limited Moore to walking from two hours to two and a half hours per day with breaks for rest as needed. (Id.) Dr. Shanks noted that Moore may continue to work up to eight hours or more per work day if tolerated. (Id.) However, despite medical management, Moore continued to weaken easily, could not climb more than a flight of stairs, and walked very slowly to avoid severe weakness. (Id. at 329.)

Moore became pregnant in the late spring of 2011. (Id. at 246.) That July Dr. Shanks added prescriptions to Moore's medication plan but Moore never filled them because of her pregnancy. (Id.) During her pregnancy, Moore reported an improvement in her double vision but continued to have nasal speech, generalized weakness, and a diminished ability to swallow. (Id.) During a follow-up visit in October 2011, Moore reported worsening limb fatigue as she was no longer able to walk at a normal pace and required rest after one flight of stairs. (Id. at 259.) Dr. Shanks noted that at that time Moore "no longer has 2 ½ hours walking at work, only an hour within a 7 hour schedule with postal delivery." (Id.) By November 2011 Moore had stopped work. (Id. at 270.) Two months later Moore suffered severe MG symptoms but only slightly worse than her baseline. (Id. at 345.) Moore reported that the prednisone was ineffective but Dr. Shanks continued to limit her Cellcept intake because of her pregnancy. (Id.)

On August 2, 2012, during a post-pregnancy follow-up appointment, Moore continued to report shortness of breath and fatigue. (Id. at 397.) In her notes from that visit Dr. Shanks expressed concerns that Moore had medication "compliance issues in the past with questionable reporting and [was] frequently 30 min[utes] late for her 30 min[ute] appointment." (Id.) Dr. Shanks noted that:

> Although [Moore] continues to state that she takes her prednisone as prescribed, I discovered after her [appointment] today that her pharmacy fill pattern indicate[s] that she does not take her medications as prescribed, and takes much less prednisone than she was given. I would conclude given that she initially responded to prednisone, that she probably didn't take it much during 2009 when I kept increasing the dose, and she may have taken some in late 2010 and early 2011 resulting in some improvement (although she was not

4

filling the Cellcept Rx between 7/2010 through 1/2010 as prescribed). This is reassuring in that the prednisone is likely still effective if she actually takes it. I will not prescribe a steroid sparing agent as she is too unreliable.

(Id. at 399-400.) After a March 2013 visit, Dr. Shanks wrote that Moore's mother was angry with her because Moore was denied Social Security benefits and Moore's mother attributed the denial to Dr. Shanks's comments that Moore did not take her medication. (Id. at 396.) Dr. Shanks noted in her report that while MG is an incurable disease, and that it is possible Moore may not respond to the usual medications, the "treatment must be at least tried." (Id.)

The record includes several Residual Functional Capacity ("RFC") reports completed by physicians. In February 2012 Dr. Victoria Dow filled completed a RFC form and opined that Moore had the ability to occasionally lift 10 pounds and to frequently lift less than 10 pounds. (Id. at 332, 338.) She further opined that Moore could stand and walk for at least two hours in an eight-hour workday and could sit for a total of about six hours. (Id. at 332.) Because of her muscle weakness, Dr. Dow found that Moore could never climb ladders, ropes, or scaffolds. (Id. at 333.) She further determined that Moore should "not have jobs that require extensive communication" because of her difficulty with prolonged speaking. (Id. at 335.) Dr. Dow concluded that Moore's report of limitations "appears to be slightly excessive, partially credible given the basically normal exams." (Id. at 338.) In September 2012, consulting physician Dr. George Andrews reviewed Moore's medical file, including Dr. Dow's RFC assessment, and opined that the initial RFC limiting her to sedentary work is appropriate. (Id. at 381.)

On June 10, 2013, three months after she noted Moore's mother's displeasure with her reporting on Moore's medication compliance issues, Dr. Shanks completed a Medical Source Statement ("MSS") regarding Moore's MG. (Id. at 386-88.) Dr. Shanks identified Moore's symptoms as fatigue of muscles after exercise, limb weakness, general fatigue, facial-muscle weakness, alteration in voice, difficulty swallowing and speaking, double vision, and choking. (Id. at 386.) She noted that Moore had significant difficulty speaking, swallowing, or breathing while on prescribed therapy, writing in the form's explanation section "some foods & saliva difficult at times." (Id.) Dr. Shanks also noted that Moore experienced significant motor weakness of muscles and extremities during repetitive activity while on prescribed therapy. (Id.) She opined that Moore will need to take unscheduled breaks during an eight-hour workday hourly, and that the breaks will last anywhere from 15 to 20 minutes. (Id. at 387.) She also opined that Moore's MG will cause her to be absent from work about three times a month. (Id.) Dr. Shanks concluded that Moore retains the capacity to lift five pounds and is limited in her ability to stand and walk during an eight-hour workday. (Id.) However, she noted that Moore retains the capacity to stand or walk at least 2 hours and that Moore has an unlimited capacity to sit during an eight-hour workday. (Id.)

**B.    Moore's Hearing Testimony**

At her hearing before the ALJ, Moore testified that she was 29 years old and that she completed high school and two years of college coursework. (A.R. 45-46.) She has two dependent children, then aged nine and one, who live with her. (Id.)

Moore also lives with her mother, her brother, and her two grandparents, who help take care of her children. (Id. at 55-56.) Before she stopped working completely in November 2011, Moore worked as a mail sorter. (Id. at 51.) She further stated that her supervisor accommodated her illness by limiting her walking and assigning her sedentary tasks. (Id. at 51-52.) Her workday was also reduced to seven hours and Moore was able to work as little as four hours or as much as seven hours during the workday. (Id. at 61.) She testified that Dr. Shanks imposed the work restrictions. (Id.)

Moore testified that she had been on disability from the U.S. Postal Service for about a year because since November 2011 her fatigue, weakness, and inability to walk long distances had rendered her unable to work. (Id. at 47-48.) Moore said that she can walk only a block and can sit for only an hour before she becomes fatigued and needs to take a break. (Id. at 48.) She further stated that she has difficulty swallowing and her speech is often slurred after talking for about 30 minutes. (Id. at 48, 53.) Moore stated that she has trouble performing chores and taking care of her personal needs. She has trouble brushing her teeth and combing her hair because of her weakness. (Id. at 57.) Her grandmother helps her with household chores like cooking, cleaning, and caring for the children. (Id. at 59.) Moore testified that she has these symptoms despite taking her prednisone daily. (Id. at 67.)

## C.    The Medical Expert's Testimony

Medical Expert ("ME") Dr. Bernard Stevens provided his opinion regarding the extent to which Moore's MG impacts her functional capacity.  At the outset of the hearing, the ALJ questioned the ME regarding the meaning of the term "significant," as used in Listing 11.12 for MG.  (A.R. 43.)  The ME responded that he did not know how to define the term for purposes of the Listing but testified that Moore had some but not all of the symptoms it described.  (Id.)  The ME testified that he had reviewed Moore's medical history and noted the relatively normal findings of the exams, which led him to conclude that she can perform sedentary work with some additional restrictions.  (Id. at 65-66.)  The ME stated that Moore is limited to occasionally lifting 10 pounds and frequently lifting 5 pounds, that she could sit for 6 hours, and that she can stand and walk for 1 to 2 hours.  (Id. at 66.)  Although the ME referenced a pulmonary test reflecting neuromuscular weakness, he stated that the weakness would not prevent Moore from performing at the RFC level he described.  (Id. at 69.)  The ME further opined that Moore would be able to complete eight-hour workdays five days weekly.  (Id. at 71.)

## D.    The Vocational Expert's Testimony

The Vocational Expert ("VE") offered testimony regarding Moore's past work, which she classified as a mail-carrier position.  (A.R. 47-48.)  The ALJ asked the VE to consider an individual with Moore's past relevant work, who is able to sit frequently and stand and walk occasionally, but who is unable to work on ladders, ropes, or scaffolds, who can frequently use her upper extremities and hands for

8

purposes of gross or fine manipulation, and who can work with coworkers and interact with the public. (Id. at 74-75.) The ALJ asked whether such a person would be able to perform Moore's past relevant work. (Id.) The VE responded "no," but found other sedentary positions that this hypothetical person would be able to perform, such as table worker, assembler, polisher, and bonder. (Id. at 75-76.) The ALJ then asked the VE whether the same individual would be able to work with further limitations, such as requiring a 10 to 15-minute break every hour. (Id. at 77.) The VE stated that such an individual would not be employable. (Id. at 78.)

### E.    The ALJ's Decision

On November 27, 2013, the ALJ found that Moore is not disabled. (A.R. 8-24.) After determining that Moore meets the insured status requirements of the Act through December 31, 2016, the ALJ engaged in the standard five-step process for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the ALJ found that Moore has not engaged in substantial gainful activity since November 24, 2011, her alleged onset date. (Id. at 13.) At step two, the ALJ found that Moore has the severe impairment of MG. (Id.) At this step, the ALJ also assessed Moore's credibility and described the medical evidence. (Id. at 14-18.) The ALJ gave Moore's testimony only slight weight after finding her symptom description to be out of proportion to records from her physical examinations, because Dr. Shanks had recorded medication compliance issues, and because contrary to Moore's contentions, symptom exacerbations that occurred during her pregnancy improved after she gave birth. (Id. at 15, 17.) At step three, the ALJ

9

determined that Moore does not have an impairment that meets or medically equals the severity of one of the listed impairments, taking into account Listing 11.12. (Id. at 18.) Before step four, the ALJ found that Moore has the RFC to perform a range of sedentary work with a number of additional limitations including the ability to sit frequently and to stand and walk occasionally. (Id. at 19.) At step four, the ALJ found that Moore cannot perform any past relevant work, but at step five the ALJ concluded that Moore can perform jobs that exist in significant numbers in the national economy, such as a bench worker in the form of table worker, assembler, polisher, and bonder. (Id. at 22-23.) Accordingly, the ALJ found that Moore is not disabled. (Id. at 24.)

## Analysis

Moore raises two main challenges to the ALJ's decision denying her benefits. First, she argues that the ALJ's RFC determination is not supported by substantial evidence because, according to her, she is unable to meet the sitting, standing, and walking requirements for full-time sedentary work. (R. 10, Pl.'s Mem. at 11.) Second, Moore argues that the ALJ erred in concluding that her condition does not meet or medically equal Listing 11.12. (Id. at 12-15.) This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted). Because the court's role is neither to reweigh the evidence nor to

substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler*, 688 F.3d at 310. In order to adequately support the decision, the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation and citation omitted).

## A.    The RFC Determination

Moore's first argument challenges the ALJ's determination that she has the RFC to perform a limited range of sedentary work. Specifically, Moore contends that the ALJ mischaracterized the ME's testimony regarding her ability to sit more than six hours in an eight-hour workday. (R. 10, Pl.'s Mem. at 11.) At the hearing, the ME testified that he did not "see any reason why [Moore] couldn't sit for, for six hours. Stand and walk would be limited between one and two hours." (A.R. 66.) In his written opinion, the ALJ noted that he gave "very great weight" to the ME's opinion and provided several reasons. (Id. at 17-18.) But in describing the ME's testimony, the ALJ wrote that the ME said that Moore can "sit more than six hours out of eight." (Id. at 17.) Moore argues that the ALJ's mischaracterizing the ME's testimony as allowing "more than" six hours of sitting instead of just six hours renders the RFC unsupported by substantial evidence.

While Moore is correct that the ALJ misstated the ME's testimony in the narrative portion of his opinion, the error had no impact on the RFC assessment and her argument amounts to the kind of second-guessing the substantial evidence

11

standard is meant to avoid. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (describing harmless error); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) (noting that the court gives an ALJ's opinion "a commonsensical reading rather than nitpicking at it"). Moore's argument overlooks the fact that the ALJ specifically limited Moore's RFC to sitting "frequently." (A.R. 19.) The term "frequently" as used in the applicable regulations is understood to mean from 1/3 to 2/3 of the work day. *See* SSR 83-10, 1983 WL 31251, at *5-6 (1983); 20 C.F.R. § 404.1567. That translates to a maximum of just under six hours in an eight-hour workday. So even if Moore is correct that the ME meant to limit her to no more than a maximum of six hours of sitting per workday, the assigned RFC is consistent with the ME's assessment. In other words, because the ALJ's RFC assessment precludes Moore from sitting more than six hours a day, the ALJ's mischaracterization of the ME's testimony as allowing for more than six hours of sitting had no impact on the RFC he assigned.

Moreover, there is substantial evidence supporting the ALJ's conclusion that Moore can perform sedentary work involving frequent sitting. The government correctly points to the fact that the ALJ supported the RFC assessment by considering the medical opinions on record, including those of Moore's treating physician and the consulting physicians. (R. 18, Govt.'s Resp. at 4.) For example, on June 10, 2012, Dr. Shanks opined that Moore retains the capacity to stand and walk for two hours and has an "unlimited" ability to sit in an eight-hour workday. (A.R. 387.) The ALJ ascribed only "slight weight" to Dr. Shanks's opinion because

he found the other limitations set forth in her RFC form were unsupported by the evidence, but the government is correct to point out that this aspect of the treating physician's opinion is less restrictive than the RFC the ALJ assigned. In addition, the ALJ gave great weight to the opinion of Dr. Dow who also found Moore capable of standing or walking for at least two hours in an eight-hour workday and of sitting for about six hours in an eight-hour workday. (Id. at 18.) Moore has not pointed to any medical records to support her contention that she is incapable of the amount of sitting described in the RFC.

To further her challenge against the ALJ's RFC determination, Moore cites to the VE's testimony that an individual limited to sitting for six hours per workday and standing and walking for one hour is not able to perform full-time sedentary work. (R. 10, Pl.'s Mem. at 11.) But that argument rests on a misread of the VE's testimony, which was a response to the ALJ's hypothetical describing a person who could sit for six hours and stand or walk for one hour in a workday, which the VE noted to total a seven-hour workday. (A.R. 78.) The VE's response that "it would be less than what's characterized as full-time, sedentary employment" was in response to the ALJ's hypothetical describing work hours less than what is required for fulltime work. (Id.) When the ALJ asked the VE to consider a person with the hypothetical RFC the ALJ eventually assigned Moore, the VE testified there are several jobs such a person could perform. (Id. at 74-75.) For these reasons, substantial evidence supports the ALJ's conclusion that Moore could perform sedentary work involving frequent sitting and occasional standing or walking.

**B.      Listing 11.12**

Moore also argues that the ALJ erred in finding that her impairment does not meet or equal Listing 11.12, which describes the criteria for presumptively disabling MG.  (R. 10, Pl.'s Mem. at 12-15.)  Under the version of Listing 11.12 that was before the ALJ the Listing is met when an individual is diagnosed with MG and has: "(A) Significant difficulty with speaking, swallowing, or breathing while on prescribed therapy; or (B) Significant motor weakness of muscles of extremities on repetitive activity against resistance while on prescribed therapy."[1]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.12.  The crux of Moore's argument here is that the ALJ erred when he concluded that she did not meet Listing 11.12 without determining how the agency defines the term "significant."  (R. 10, Pl.'s Mem. at 12-13.)  Moore argues that the ALJ should have interpreted the term "significant" to mean "severe," because the regulations use those terms interchangeably.  To support this argument she points to the regulatory definition of "severe impairment" for purposes of step two, which describes an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c) & Pt. 404, Subpt. P. App. 1 § 12.00(A); (R. 10, Pl.'s Mem. at 12).  But the fact that the broad definition for a generic "severe" impairment at step two references the term

---

[1] On September 29, 2016, a new version of Listing 11.12 became effective.  This version provides new criteria for establishing Listings-level MG.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 11.00, 11.12.  However, neither party submitted supplemental papers bringing the change to the court's attention or arguing that the new version should apply retroactively.  Accordingly, this court will review only whether the ALJ properly considered the criteria that were in effect on November 27, 2013, the date of his decision.

"significantly" in relation to limits on a person's ability to do work activities is a completely distinct context from the Listings, where impairments are described with specificity to identify presumptively disabling limitations. As the ALJ reasoned, one can have any number of severe impairments without meeting the Listings criteria for significant limitations in specific functions, because otherwise there would be no need for separate step-two and step-three evaluations. (A.R. 18-19.)

Moore also points out that elsewhere in his decision the ALJ wrote that "no one doubts that the claimant has significant limitations due to her condition" and that "sedentary work represents a significantly restricted range of work," and argues that those statements are inconsistent with his findings at step three that she does not meet the Listings 11.12 criteria. (R. 10, Pl.'s Mem. at 13.) But Listing 11.12 specifically targets significant limitations in speaking, swallowing, or breathing or significant motor weakness. The ALJ did not conclude elsewhere that Moore suffers from these deficiencies. On the contrary, he found that testing showed that Moore had only mild or no motor weakness on repetitive testing. (A.R. 18.) The ALJ also recounted Moore's normal pulmonary function tests, normal (although quiet) speech, and only mild difficulty with swallowing. (Id. at 17-18.) There is nothing inconsistent about the ALJ reaching those conclusions alongside his determination that Moore's overall impairment causes significant limitations in her condition and available range of work.

Moreover, as the government correctly points out, in order to meet the Listings 11.12 criteria Moore must establish that she had the described significant limitations "while on prescribed therapy." *See* 20 C.F.R. 404, Subpt. P, App. 1 § 11.12. But the ALJ specifically found that "the record suggests that [Moore] has not been entirely compliant with her treatment regime." (A.R. 19.) Moore argues that the record "demonstrates that treatment would not completely control" her disease, but she must show that she complied with prescribed therapy to establish that she meets the listing criteria. (R. 23, Pl.'s Reply at 3.) In any event, the record supports the ALJ's conclusion that Moore does not meet the treatment compliance prong of Listing 11.12. After Moore became pregnant several months before her claimed disability onset date, the prescribed therapies that Dr. Shanks suggested had to be delayed until after her pregnancy. (Id. at 329.) Dr. Shanks noted that "once she is no longer pregnant we will consider trying other immunosuppressant therapies." (Id.) While Dr. Shanks noted the potential beneficial effects of Moore taking various medications, such as "Cellcept, Immuran, or other long-term immunosuppressant[s]," she stated that she could not prescribe those medications during Moore's pregnancy. (Id. at 323.) Moreover, the record post-dating her pregnancy indicates that Moore was not compliant with Dr. Shank's prescribed medication regime. In her treatment notes on August 2, 2012, which was several months after Moore gave birth, Dr. Shanks noted that a review of Moore's pharmacy fill pattern indicated that "she does not take her medications as prescribed, and takes much much less prednisone than she was given." (Id. at 399.)

Dr. Shanks further noted that she "would conclude given that she initially responded to prednisone that she probably didn't take it much during 2009 when I kept increasing the dose, and she may have taken some in late 2010 and early 2011 resulting in some improvement. . . . This is reassuring in that the prednisone is likely still effective if she actually takes it." (Id. at 399-400.) In March 2013 Dr. Shanks noted Moore's reluctance to take medications and wrote that although her condition may be difficult to treat effectively with medication, "the treatment must be at least tried." (Id. at 396.) Thus the record supports the ALJ's finding that at least through March 2013, Moore failed to follow prescribed treatment. *See Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (affirming where ALJ "found it particularly instructive that [the claimant] either refused or utterly failed to adhere to the treatment programs prescribed by her physicians").

At step three it is Moore's burden to show that she meets all of the criteria set forth in Listing 11.12. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The only evidence she cites in her brief to support her argument that she meets the listings criteria is Dr. Shanks's June 2013 RFC opinion, where she checked boxes indicating that Moore meets the listings criteria. (A.R. 386.) Moore argues that the ALJ erred in giving that opinion only "slight weight," and asserts that if she had given the opinion the weight it deserves the ALJ would have been bound to find her disabled under Listing 11.12.

A treating doctor's opinion receives controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. *See* 20

C.F.R. § 404.1527(c)(2); *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). If an ALJ denies a treating physician's opinion controlling weight, he is still required to determine what value it merits. *See* 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In assigning that value that ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, the ALJ gave several supported reasons for ascribing only "slight weight" to Dr. Shanks's opinion. First, he found that her opinion is "not well supported by the medical evidence and is not consistent with other substantial evidence." (A.R. 18.) He gave several examples of the inconsistency, such as the evidence undermining Moore's alleged limitations with her hand usage and her inability to balance, kneel, or squat, as well as conflicting opinions from three consulting physicians. (Id. at 18, 22.) The ALJ further noted that one month before Dr. Shanks opined in her RFC that Moore has "significant motor weakness of muscles of extremities on repetitive activity" Dr. Shanks's treatment notes indicated she had no weakness at all. (A.R. 18, 386, 391.) The ALJ further reasoned that some of her findings were based on Moore's subjective complaints

which the ALJ found lacking in credibility,[2] (id. at 18), which is a permissible consideration in weighing a treating physician's opinion, *see Ghiselli v. Colvin*, No. 14-2380, __ F.3d __, 2016 WL 4939535, at *3 (7th Cir. Sept. 16, 2016). The ALJ also pointed out the inherent inconsistency in Dr. Shanks's opinion that Moore had significant motor weakness while on prescribed therapy and her notes indicating that Moore was not always compliant with prescribed therapy. (Id. at 18.) Because all of the reasons the ALJ gave for discounting Dr. Shanks's RFC opinion are well-supported by the record, Moore has not shown any error in the ALJ's weighing of the physicians' opinions. And because Moore has pointed to no evidence outside of Dr. Shanks's opinion to support her assertion that she meets Listing 11.12, she has not shown that the ALJ engaged in any reversible error at step three.

## Conclusion

For the foregoing reasons, Moore's motion for summary judgment is denied and the Commissioner's final decision is affirmed.

**ENTER:**

_Young B. Kim_
**Young B. Kim**
**United States Magistrate Judge**

---

[2] Moore did not challenge the ALJ's adverse credibility finding or his conclusion that Moore's symptom description is entitled to only "slight weight." (See A.R. 14-17.)